IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

v.

EDWARD SHANE SMALLWOOD

CRIMINAL CASE NO.

1:13-cr-00381-TCB-RGV

## MAGISTRATE JUDGE'S REPORT, RECOMMENDATION, AND ORDER ON DEFENDANT'S PRETRIAL MOTIONS

Defendant Edward Shane Smallwood ("Smallwood") is charged in a three-count indictment with knowingly possessing a firearm after a felony conviction, in violation of 18 U.S.C. § 922(g), and with two instances of knowingly impersonating a federal officer, in violation of 18 U.S.C. § 912. [Doc. 14].[1] Smallwood has filed motions to suppress evidence, [Doc. 20], and statements, [Doc. 21], as well as a motion to dismiss Counts One and Three of the indictment, or, alternatively, for a bill of particulars, [Doc. 27]. Smallwood further moves to suppress the statements and testimony of his wife, Sandra Smallwood ("Mrs. Smallwood"), which impinge upon the confidential marital communications privilege. [Doc. 26]. Following an

---

[1] The listed document and page numbers in citations to the record in this Report and Recommendation refer to the document and page numbers shown on the Adobe file reader linked to the Court's electronic filing database, CM/ECF.

evidentiary hearing on January 22, 2014,[2] the parties filed post-hearing briefs, [Docs. 53 & 56], on the motions.[3]  For the following reasons, it is **RECOMMENDED** that Smallwood's motions to suppress evidence and statements, [Docs. 20 & 21], and to dismiss Counts One and Three of the indictment, or, alternatively, for a bill of particulars, [Doc. 27], be **DENIED**, and that his motion to suppress the statements and testimony of Mrs. Smallwood, [Doc. 26], be **GRANTED IN PART** and **DENIED IN PART**.

## I.  STATEMENT OF FACTS

### A.   The July 15, 2013, Arrest

On July 15, 2013, Investigator Dominick Crea ("Investigator Crea") of the Gwinnett County Sheriff's Department was assigned to execute a Gwinnett County arrest warrant for Smallwood.  (Tr. at 6-7).  The warrant charged Smallwood with impersonating a police officer, possession of a firearm by a convicted felon, and operating a motor vehicle with unauthorized blue lights.  (Tr. at 9).  Investigator Crea also received a package containing additional information about Smallwood.

---

[2] See [Doc. 44] for the transcript of the evidentiary hearing.  Citations to the evidentiary hearing transcript hereinafter will be referred to as "(Tr. at ___)."  In addition, Smallwood has submitted exhibits which will be referred to as "(Def. Ex. at ___)."

[3] The government has also filed separate responses to the motions to suppress testimony and to dismiss Counts One and Three of the indictment.  See [Docs. 34 & 35].

(Tr. at 7, 26-28).  Among other things, the package indicated that Smallwood drove a black Dodge Charger ("Charger").  (Tr. at 8, 19).  Investigator Crea reviewed the paperwork and then went to the address listed on the warrant to look for Smallwood's car.  (Tr. at 8).[4]  On his way there, Investigator Crea contacted Investigator James Duffield ("Investigator Duffield") of the Gwinnett County Sheriff's Department, to ask for assistance.  (Tr. at 8, 63).[5]  Investigator Duffield responded that he was aware of the Smallwood investigation and that he had already been instructed to look for Smallwood.  (Tr. at 8).  In fact, before he was called by Investigator Crea, Investigator Duffield had already been watching Smallwood's residence for about 10 or 15 minutes.  (Tr. at 64-65).  Investigator Duffield did not observe any signs of movement at the residence during that time, (Tr. at 78), but he did note that the Charger was parked in the driveway, (Tr. at 64-65).

The officers met briefly at a restaurant near Smallwood's residence to plan the arrest, and Investigator Crea said that he would go to the address on the warrant to determine if the Charger was still there and whether they should attempt to make

---

[4] The warrant listed Smallwood's address as 109 Beacon Street, Stockbridge, Georgia.  (Tr. at 19).

[5] Duffield also served as a Task Force Officer of the U.S. Marshals Southeast Regional Fugitive Task Force ("Task Force").  (Tr. at 8, 63).

an arrest. (Tr. at 8-9). Investigator Crea arrived at the residence, which he described as a "very small" ranch house, at 11:15a.m. (Tr. at 9, 30, 36). He noticed the Charger parked in the driveway, (Tr. at 9, 20), although he did not see any signs of activity at the house, such as motion around the windows or blinds, (Tr. at 31). Investigator Crea then contacted Investigator Duffield and asked him to bring additional officers to help effect an arrest. (Tr. at 9). Investigator Duffield called for reinforcements from the Task Force, (Tr. at 65), and Investigator Crea remained at the residence for about an hour, (Tr. at 31), until Investigator Duffield arrived with the additional officers, (Tr. at 10).[6] When Investigator Crea saw the officers approaching, he exited his vehicle and went to the rear of the house, while the other officers proceeded to the front of the house. (Tr. at 10, 66).[7] The officers were wearing tactical, bulletproof vests bearing the words "Sheriff," "U.S. Marshals," or "Police," (Tr. at 66, 84), and their weapons were drawn and pointed toward the front door as they approached the house, (Tr. at 70-71, 75).

---

[6] Investigator Duffield testified that the Task Force is comprised of a number of agencies from the greater Atlanta area, and that Deputy U.S. Marshals as well as officers from Henry County and Gwinnett County were all present at the arrest. (Tr. at 74). Investigator Crea did not recall how many Task Force officers accompanied Investigator Duffield, but it appears that a total of seven to ten officers were present at the arrest. See (Tr. at 29, 34).

[7] At some point, several other officers, in addition to Investigator Crea, were also positioned at the back of the house. (Tr. at 32).

4

As the officers advanced to the front door, Smallwood stepped out of the house onto the front porch, told the officers to "come on in," and motioned with his hand indicating that the officers could enter the residence. (Tr. at 66, 76, 84). The officers immediately ordered Smallwood to the ground and placed him in handcuffs in the front yard. (Tr. at 67, 85).[8] At the time, Mrs. Smallwood was inside the house with a small child. (Tr. at 72, 85). The officers asked Mrs. Smallwood to step outside of the house, and she walked onto the front porch, bringing the child with her. (Id.); see also (Tr. at 11). Mrs. Smallwood inquired several times about what was going on, (Tr. at 11, 40), but she stopped asking when one of the officers told her that Investigator Crea would speak with her momentarily, (Tr. at 11, 22). After being placed under arrest, Smallwood was escorted by an officer to the back seat of a Henry County patrol car, which was parked along the road in front of the house. (Tr. at 10-11, 53, 67, 77).

When Investigator Crea learned that Smallwood had been taken into custody, he returned to the front of the house and proceeded to enter the residence to conduct a protective sweep of the premises. (Tr. at 10-11, 53). Investigator Josh Mauney

---

[8] Although Investigator Crea could not see what was happening at the front of the house, he could hear the officers "yelling or loudly telling instructions" for a brief interval. (Tr. at 10, 32).

("Investigator Mauney") of the Fayette County Sheriff's Office,[9] along with Investigator Duffield and several other officers, also swept the residence. (Tr. at 35-36, 67, 83, 90). Investigators Crea and Duffield testified that the purpose of the sweep was to ensure officer safety. (Tr. at 11, 67, 73). In particular, Investigator Duffield testified that safety was a concern because there was a firearms charge involved, the officers had their backs to the residence at certain points, and the officers could not see inside the house, while people within the house could see outside. (Tr. at 11, 67, 73, 75). During the sweep, Investigator Crea observed a black bag with the word "Police" written in white letters along the side, sitting "wide open" on the kitchen table. (Tr. at 15, 39). Investigator Crea also noticed what appeared to be a U.S. Marshals badge inside the bag, (Tr. at 15-16),[10] as well as a bulletproof vest leaning against a wall in a den area near the living room, (Tr. at 16, 51). The sweep lasted no more than a few minutes, (Tr. at 38), and the officers did not seize any evidence or find anyone else inside the house, (Tr. at 11, 16, 67, 85, 91).

When the sweep was finished, Investigator Crea went outside and asked Mrs. Smallwood to come back inside the house so that she would not have to stand in the

---

[9] Investigator Mauney also served as a Task Force officer for the U.S. Marshals. (Tr. at 83).

[10] The apparent badge was later determined to be a belt buckle bearing the U.S. Marshals insignia. (Tr. at 39)

front yard holding the child in view of the neighbors.  (Tr. at 11-12).  Investigator Crea then accompanied Mrs. Smallwood into the house, and Mrs. Smallwood sat down in a chair in the living room.  (Tr. at 12, 43-44); see also (Def. Ex. 2). Investigator Mauney and another officer, Special Agent Stevens, were also in the living room at the time.  (Tr. at 46-47).[11]  Investigator Crea explained to Mrs. Smallwood why the officers were there and why her husband had been arrested. (Tr. at 12).  In particular, Investigator Crea described each of the charges against Smallwood in the Gwinnett County arrest warrants.  (Tr. at 45).  Investigator Mauney also informed Mrs. Smallwood that her husband was a convicted felon, and not a Deputy U.S. Marshal.  (Tr. at 86).  Investigator Crea testified that Mrs. Smallwood appeared to be a "little confused," at first, because she was under the impression that Smallwood was a police officer, (Tr. at 23, 41); see also (Tr. at 86), but that after the charges were explained, she appeared to understand what the officers were telling her and why they were there, and she seemed "very composed," (Tr. at 12), and "very calm . . . [and] rational," (Tr. at 22), throughout their conversation.  Similarly, Investigator Mauney noted that Mrs. Smallwood was speaking normally, and that her demeanor was "calm, cool and collected[.]"  (Tr. at 86).

---

[11] Investigator Mauney testified that a fourth officer was also present for part of the time that the officers interacted with Mrs. Smallwood in the house.  (Tr. at 92).

Investigator Crea then asked Mrs. Smallwood if she would consent to a search of the residence and the car outside.  (Tr. at 12, 87).  Mrs. Smallwood quickly responded that she "didn't have a problem with [the officers] searching the house or the vehicle outside."  (Tr. at 12-13).[12]  Investigator Crea also asked Mrs. Smallwood whether Smallwood had a gun, and if so, where he usually kept it.  (Tr. at 13, 48).  Mrs. Smallwood replied that Smallwood had a gun that he usually kept in the car, (id.), and she specifically gave her consent for the officers to search for the gun, (Tr. at 61).  Investigator Crea next asked Mrs. Smallwood if she would give him the keys to the car so he could look for the gun.  (Tr. at 13, 53-54, 87).  Mrs. Smallwood agreed, retrieved the keys to the Charger, and gave them to Investigator Crea.  (Id.).   Mrs. Smallwood and Investigator Crea then went outside, and Investigator Crea searched inside the Charger for the gun.  (Tr. at 13).  Investigator Crea looked under the seats, in the glove compartment, in the center console and the trunk, but did not find a firearm.  (Id.).  However, he found emergency blue lights in the front and rear windows, and a U.S. Marshals badge and a "credentials type of wallet setting," all of which he seized as evidence.  (Tr. at 13-14).

---

[12] Investigator Crea testified that he would typically ask people to sign a consent form to consent to a search of their residence, but that, on this particular occasion, he asked for Mrs. Smallwood's consent in the presence of two other officers instead, since he did not have a form with him at the time.  (Tr. at 18).

After the search of the vehicle, Investigator Crea and Mrs. Smallwood went back inside the house, and Investigator Crea asked Mrs. Smallwood if she could think of any other place where the gun might be found. (Tr. at 14). Mrs. Smallwood said that it might be in the bedroom. (Id.). Investigator Crea testified that, because Mrs. Smallwood was unusually cooperative with the investigation, he allowed her to look for the gun in the bedroom, with another officer present, while Investigator Crea remained in the living room. (Tr. at 14-15). Mrs. Smallwood found the gun in a drawer in the bedroom just a few moments later. (Tr. at 15). Investigator Crea then walked down the hall to the bedroom, and Mrs. Smallwood showed him where the gun was located. (Id.); see also (Def. Ex. 6). Investigator Crea seized the firearm and several magazines. (Tr. at 15); see also (Tr. at 51). While Investigator Crea was collecting the evidence, Mrs. Smallwood also located the box in which the gun was originally purchased, and offered it to Investigator Crea. (Tr. at 15). Investigator Crea said that he did not need the box, but Mrs. Smallwood insisted, so Investigator Crea took the box and placed the firearm and magazines inside. (Id.). Investigator Crea also took the bag marked "Police" and the bulletproof vest, and then secured all of the evidence in the trunk of his car for safekeeping. (Tr. at 16).[13] Investigator

---

[13] Investigator Crea testified that he seized these items, as well as the items from the Charger, because they related to the pending charges for impersonating an officer. (Tr. at 14, 52). A later inventory of the bag revealed a cell phone inside, but Investigator Crea did not search the cell phone. (Tr. at 56; Def. Ex. 8).

Crea estimated that the total amount of time he had spent in the house, from the time of the initial sweep until the conclusion of the search, was less than 30 minutes. (Tr. at 36).

Mrs. Smallwood did not ask to speak with Smallwood, (Tr. at 54), or say she wanted the officers to stop searching at any time, (Tr. at 88), and Investigator Mauney testified that Mrs. Smallwood remained "calm and collected" throughout the entire duration of the search, (id.). At some point during the search, Mrs. Smallwood also told Investigator Mauney that she was an avid hunter and that she had hunted various animals that were mounted for display in her house. (Tr. at 87). Investigator Duffield, who remained with Smallwood after the sweep, testified that he was not aware that Smallwood ever objected to the search of either his house or his car, although both of these were visible to Smallwood from his position in the back of the patrol car. (Tr. at 67, 77). Investigator Duffield also explained to Smallwood the charges on the warrants for his arrest, but Investigator Duffield did not ask any questions relating to the charges. (Tr. at 67-68). Smallwood was sobbing, (Tr. at 80), and repeatedly told Investigator Duffield that he had not done anything wrong, (Tr. at 68-69).

A few minutes after Investigator Duffield first approached Smallwood at the patrol car, Investigator Crea came to speak with Smallwood because he had been

informed that Smallwood wanted to talk.  (Tr. at 16-17, 68).  Investigator Crea read

Smallwood his <u>Miranda</u>[14] rights, in the presence of Investigator Duffield, from a

printed card provided to him by the Gwinnett County Sheriff's Department.  <u>See</u> (Tr.

at 17, 24, 68; Def. Ex. 9).  Specifically, Investigator Crea  advised Smallwood that he

had the right to remain silent and that any statements he made could be used

against him in court.  (Def. Ex. 9).  He further advised him that he had the right to

speak to an attorney, to have one present during questioning, and to have one

appointed for him if he could not afford one.  (<u>Id.</u>).   Investigator Duffield also told

Smallwood that he could "decide at any time to exercise these rights and not answer

any questions or make any statement," and he asked him whether he understood

the rights that were explained to him and if he wanted to speak with the officers.

(<u>Id.</u>).  Smallwood responded that he understood his rights.  (Tr. at 17).  Investigator

Crea did not ask Smallwood any questions about the charges against him, but

instead told Smallwood that he was not the investigating officer, and that if

Smallwood wanted to make a statement, it would be better for him to speak with the

investigator who was responsible for obtaining the warrants for his arrest.  (Tr. at

17, 55).   Investigator Duffield also testified that, after <u>Miranda</u> warnings were

administered, he "believe[d] [he] asked [Smallwood] about a weapon that was in the

---

[14] <u>Miranda v. Arizona</u>, 384 U.S. 436 (1966).

house," and Smallwood said it belonged to his wife.  (Tr. at 69, 81).  Investigator Duffield testified that he did not ask Smallwood any additional questions and that Smallwood did not tell him anything else.  (Tr. at 69).

After Investigator Crea concluded the search, he transferred Smallwood from the patrol car into his undercover vehicle, and then drove Smallwood to Gwinnett County Jail, with Investigator Duffield following behind in a separate vehicle.  (Tr. at 18, 69).  Investigator Crea and Smallwood engaged in "general chitchat" throughout the trip, which took about an hour, but they did not speak about anything pertaining to the charges against Smallwood.  (Tr. at 18, 25-26, 56).[15]

**B.      The August 19, 2013, Arrest**

On August 19, 2013, an arrest team arrived at Smallwood's residence, located at 109 Beacon Street, Stockbridge, Georgia, to execute a federal arrest warrant that had issued from the Northern District of Georgia.  (Tr. at 94-96).  One of the members of the arrest team was Special Agent James Taylor Booth ("Agent Booth") of the Bureau of Alcohol, Tobacco, Firearms, and Explosives.  (Id.).[16]  Sometime between approximately 9:00p.m. and 11:00p.m., the agents formed a tactical stack

---

[15] For instance, Investigator Crea testified that Smallwood talked about his ex-wife and child custody issues.  (Tr. at 18, 55-56).

[16] Deputy Donald Hathaway ("Deputy Hathaway") of the U.S. Marshals Service, testified that a total of seven officers were present at the federal arrest.  (Tr. at 113, 116-17).

at the door of Smallwood's residence, and Deputy Hathaway knocked on the door and announced the agents' presence. (Tr. at 96). Smallwood came to the door, and the agents placed him handcuffs on the steps of the front porch. (Id.). Agent Booth then led Smallwood to the front of Smallwood's car, which was parked in the driveway, and told him that he was under arrest. (Tr. at 96-97). Smallwood stayed by the car while Agent Booth went to speak with Mrs. Smallwood, and Smallwood's handcuffs were then removed, and subsequently reapplied together with a belly-chain device and leg shackles. (Id.). Agent Booth next secured Smallwood in the front passenger seat of Agent Booth's vehicle, and he explained to Smallwood the charges against him. (Tr. at 97-98). Agent Booth testified that Smallwood appeared to understand the charges, (Tr. at 98), and that he did not read Smallwood his Miranda rights at that time because he had no intention of interviewing him after the arrest, (Tr. at 99-100).

Agent Booth then transported Smallwood to the Atlanta Detention Center, with Deputy Hathaway following in a separate vehicle. (Tr. at 98). Within minutes of their departure, Smallwood began asking Agent Booth whether someone is allowed to have a Marshals' badge, without using it. (Tr. at 99, 111). Agent Booth told Smallwood that he should not be talking because he had not been advised of his Miranda rights. (Tr. at 100). Soon afterwards, Smallwood began speaking about

13

a first-offender conviction, and Agent Booth again told Smallwood that he had not been read his rights. (Tr. at 100, 111). Smallwood then began saying that he had gotten into trouble because of the actions of another individual. (Id.). Agent Booth activated his blue lights, pulled over to the emergency lane, and called Deputy Hathaway to come to the passenger side of the car. (Tr. at 100). With Deputy Hathaway present, Agent Booth read Smallwood his Miranda rights from a Miranda rights card issued by the Federal Law Enforcement Training Center. (Tr. at 100-01).[17] Specifically, Agent Booth advised Smallwood that he had the right to remain silent and that anything he said could be used against him in court; that he had the right to consult with an attorney and to have one present during questioning; and that, if he could not afford an attorney, one would be appointed to represent him prior to any questioning. (Id.). Smallwood replied that he understood his rights and that he wanted to talk to Agent Booth. (Id.). Smallwood spoke to Agent Booth about the charges pending against him during the remainder of the trip to the Detention Center, and after they arrived there. (Tr. at 102-03).

---

[17] Agent Booth testified that no more than 25 minutes had passed from the time that Smallwood was placed in restraints to the time he was advised of his Miranda rights. (Tr. at 105).

## II.  DISCUSSION

Smallwood moves to suppress the evidence seized during the search of his residence on July 15, 2013, [Doc. 20], as well as any statements he made prior to <u>Miranda</u> warnings on July 15, 2013, and August 19, 2013, [Doc. 21; Doc. 53 at 37-39]. Smallwood has also filed a motion to suppress any testimony or statements by Mrs. Smallwood that would impinge upon the confidential marital communications privilege, [Doc. 26], and a motion to dismiss Counts One and Three of the indictment as insufficient in their allegations, [Doc. 27].  The Court will consider each of the pending motions and the parties' arguments in turn.

### A.     Motion to Suppress Evidence

Smallwood argues that the evidence seized from his residence and vehicle pursuant to the search of July 15, 2013, must be suppressed because the government has failed to show that Mrs. Smallwood's consent to the search was valid.  [Doc. 53 at 24-33].  Smallwood further argues that the protective sweep that preceded the search of July 15 was unlawful, [<u>id.</u> at 17-24], and thus, even were Mrs. Smallwood's consent to the search valid, the evidence should nonetheless be suppressed because the consent was "tainted by the illegal protective sweep," [<u>id.</u> at 36].   The government responds that the protective sweep was a valid sweep intended to ensure officer safety, and that the evidence from Smallwood's residence is

admissible because it was seized pursuant to a valid, lawful consent search, which was untainted by any prior constitutional violations.  See [Doc. 56].  Finally, Smallwood argues that certain pieces of evidence were improperly seized because of "problems with the search itself[.]"  [Doc. 53 at 36].

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV.  Consequently, "a search or seizure must normally be conducted under the authority of a court-issued warrant, supported by a finding of probable cause to believe that evidence of a crime will be found in the targeted location."  United States v. Cruz, Criminal Action No. 1:11–CR–0377–WSD–CCH, 2012 WL 1564671, at *5 (N.D. Ga. Mar. 19, 2012), adopted by 2012 WL 1564667, at *3 (N.D. Ga. Apr. 30, 2012) (citing Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619 (1989); Mincey v. Arizona, 437 U.S. 385, 390 (1978)).  Warrantless "searches and seizures inside a home . . . are presumptively unreasonable," United States v. Bervaldi, 226 F.3d 1256, 1262-63 (11th Cir. 2000) (citing Payton v. New York, 445 U.S. 573, 586, 603 (1980)), subject only to "a few specifically established and well-delineated exceptions," Mincey, 437 U.S. at 390 (quoting Katz v. United States, 389 U.S. 347, 357 (1967)).  "Under the doctrine commonly known as the exclusionary rule, evidence is inadmissible if it is obtained through a search and seizure that is

conducted without a warrant and is not subject to one of the specific exceptions to the warrant requirement." Cruz, 2012 WL 1564671, at *5 (citing Mapp v. Ohio, 367 U.S. 643, 655 (1961)). Since a warrantless search or seizure is presumptively invalid, the government bears the burden of establishing by a preponderance of the evidence that a particular exception to the warrant requirement applies. Michigan v. Tyler, 436 U.S. 499, 509 (1978); Vale v. Louisiana, 399 U.S. 30, 34 (1970).

"Consent is one such exception; so is a properly limited protective sweep of an area incident to a person's arrest." United States v. Barsoum, No. 8:11–cr–548–T–33MAP, 2012 WL 1405699, at *2 (M.D. Fla. Apr. 5, 2012), adopted by 2012 WL 1405679, at *1 (M.D. Fla. Apr. 23, 2012) (citing Maryland v. Buie, 494 U.S. 325, 337 (1990); Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973)). The only evidence seized in this case was taken after Mrs. Smallwood ostensibly consented to a search of the residence and the car, and it is undisputed that no evidence was seized during the protective sweep. See (Tr. at 11, 16, 60-61, 85, 91). Nevertheless, as the legality of the protective sweep is relevant to the Court's resolution of whether Mrs. Smallwood's consent was valid, and particularly whether it was tainted, the Court will first address the protective sweep in considering the motion to suppress evidence.

1.     <u>Protective Sweep of July 15, 2013</u>

A protective sweep is "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others," and is "narrowly confined to a cursory visual inspection of those places in which a person might be hiding." <u>Buie</u>, 494 U.S. at 327.[18]   The <u>Buie</u> Court identified two types of protective sweeps. <u>See</u> <u>United States v. Mayo</u>, 792 F. Supp. 768, 773 (M.D. Ala. 1992). First, incident to an in-home arrest, officers may "as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." <u>Buie</u>, 494 U.S. at 334.  This has been characterized as a type-one <u>Buie</u> search. <u>See</u> <u>Cruz</u>, 2012 WL 1564671, at *6 (<u>citing</u> <u>United States v. Sunkett</u>, 95 F. Supp. 2d 1367, 1368 (N.D. Ga. 2000)).   Second, a more extensive search is permitted if there are "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the

--------------------

[18] Federal courts, including the Eleventh Circuit, have "expanded Buie beyond in-home arrests pursuant to a warrant to all situations wherein officers are lawfully present in a home."  <u>United States v. Legette</u>, 260 F. App'x 247, 249-50 (11th Cir. 2008) (per curiam) (unpublished) (citations omitted).  <u>See also</u> <u>Cruz</u>, 2012 WL 1564671, at *6 (<u>citing</u> <u>United States v. Carabollo</u>, 595 F.3d 1214, 1224 (11th Cir. 2010); <u>United States v. Miller</u>, 430 F.3d 93, 99 (2d Cir. 2005); <u>United States v. Martins</u>, 413 F.3d 139, 150 (1st Cir. 2005)).

arrest scene." <u>Buie</u>, 494 U.S. at 334.  This has been characterized as a type-two <u>Buie</u> search.  <u>See</u> <u>Cruz</u>, 2012 WL 1564671, at *6 (<u>citing</u> <u>Sunkett</u>, 95 F. Supp. 2d at 1368). Smallwood argues that the sweep was illegal because "none of the [g]overnment's witnesses claimed that they had any belief, reasonable or otherwise, that someone was inside [] Smallwood's residence at the time of the sweep."  [Doc. 53 at 17].  The government argues that the sweep was a valid type-one <u>Buie</u> search which did not require any reasonable suspicion because the arrest "took place just outside the front door, immediately after Smallwood had stepped out of the residence," [Doc. 56 at 14], and that the sweep was also a valid type-two <u>Buie</u> search because the officers had a reasonable belief that "the house contained an individual posing a danger to those on the arrest scene," [<u>id.</u> at 16].

The protective sweep in this case does not fall under either of the scenarios articulated by the Supreme Court in <u>Buie</u>.  First, the sweep was not a permissible type-one <u>Buie</u> search for which no reasonable suspicion is necessary because Smallwood was arrested outside of the residence, and the first category of <u>Buie</u> search applies only to in-home arrests.  <u>See</u> <u>United States v. Scott</u>, 517 F. App'x 647, 649 (11th Cir. 2013) (per curiam) (unpublished) (collecting cases) (citations omitted). This distinction is not without significance.  Following <u>Buie</u>, the Eleventh Circuit and other courts have drawn a sharp line between in-home arrests and arrests

occurring immediately outside the home, and have found that reasonable suspicion is required to conduct a protective sweep of a residence even when the arrest takes place at the "threshold" of the door or "just outside" the residence. See, e.g., id. at 648-49 (citations omitted) (where defendant was arrested "just outside the front door," protective sweep "not justified under *Buie* absent reasonable suspicion that there were dangerous individuals in the home"); Barsoum, 2012 WL 1405699, at *1-3 (protective sweep incident to arrest held invalid where agents arrested defendant on the "portico" outside the "threshold" of his house); see also United States v. Wright, 324 F. App'x 800, 803 (11th Cir. 2009) (per curiam) (unpublished) (internal marks omitted) (quoting Payton, 445 U.S. at 590) ("[T]he Fourth Amendment has drawn a firm line at the entrance to the house."). Cf. Sunkett, 95 F. Supp. 2d at 1368-71 (type-one Buie sweep of residence held valid where defendant was arrested during physical altercation with officers "just outside the front door," but where defendant was initially engaged by officers while he was completely inside the residence, and then turned and ran further inside the residence to evade arrest; and where other officers were already lawfully inside the residence at the time of the arrest, having entered through the back when they heard the ensuing struggle inside). Investigator Crea clearly affirmed at the evidentiary hearing that it was his understanding that Smallwood was arrested outside, not inside, the house, (Tr. at

35); and Investigator Duffield explained that the officers initially "made contact" with Smallwood and placed him in handcuffs, after he had already been "ordered to the ground in the front yard." (Tr. at 67); see also (Tr. a 85). Thus, the protective sweep of the residence in this case was not a valid type-one Buie search because the arrest occurred outside of the residence.

Nor is the Court persuaded by the government's contention that the sweep in this case may be justified as a type-two Buie sweep. Neither Investigator Crea nor Investigator Duffield, both of whom had observed the house shortly before the arrest, had any reason to believe that anyone other than Smallwood, whose car was parked outside, was inside the residence. See (Tr. at 31, 78). And contrary to the government's contention, see [Doc. 56 at 16-17], the fact that Mrs. Smallwood eventually stepped out of the house, carrying a small child, did not make it any more likely that a dangerous individual remained within, particularly since Smallwood had already been apprehended at that time. See (Tr. at 11, 72, 85). To be sure, the officers could not have known with certitude whether anyone else was inside the house, but the mere "lack of information about whether anyone inside the house posed any danger cannot be used to justify a protective sweep." Scott, 517 F. App'x at 649 (citation omitted).

The house was also "very small," (Tr. at 36), and there is no indication that any other vehicles besides the Charger were parked at the residence, see (Tr. at 9, 20, 64-65). And while Investigator Duffield testified that he conducted the sweep to ensure officer safety because there was a firearms charge involved, (Tr. at 73), that charge was only against Smallwood, and the sweep occurred only after Smallwood was taken into custody, see (Tr. at 85). Similarly, while Investigator Crea knew that a firearms charge was involved and that Smallwood had a previous arrest for aggravated assault, see (Tr. at 26, 28), he indicated at the evidentiary hearing that he had no reason to be especially cautious in attempting to effect Smallwood's arrest at his residence, (Tr. at 26). Investigator Duffield also stated that he was concerned about officer safety because the officers had their backs to the residence at certain points, and the officers could not see inside the house, while people within the house could see outside. (Tr. at 73, 75). However, this is true virtually any time an arrest is made outside of a residence, but that alone does not give rise to a reasonable inference that an individual posing a threat to officer safety is concealed inside the residence. Under the totality of the facts and circumstances of this case, therefore, there was no reasonable basis for believing that Smallwood's residence harbored an individual posing a danger to those on the arrest scene after Smallwood was taken into custody in the front yard and his wife and the child she was carrying had exited

the residence, and the sweep may not be justified as a valid type-two <u>Buie</u> search incident to arrest.

That the sweep was not permitted under the circumstances elaborated in <u>Buie</u> does not end the Court's inquiry, however, because "most courts . . . have expanded Buie beyond in-home arrests . . . to all situations wherein officers are lawfully present in a home." <u>Legette</u>, 260 F. App'x at 249-50 (citations omitted). The government argues that even if the sweep cannot be justified as a protective sweep incident to arrest, the officers were nonetheless entitled to sweep the residence once they had already entered for independently valid reasons. <u>See</u> [Doc. 56 at 19-21]. Specifically, the government contends that the officers were lawfully inside the residence "based on Smallwood's invitation to enter, and for their interview of [Mrs. Smallwood]," [<u>id.</u> at 19 (emphasis omitted)], and that, once inside, the officers properly swept the residence to ensure their safety. However, the officers' conversation with Mrs. Smallwood cannot serve to justify the protective sweep because the sweep was conducted before the officers accompanied Mrs. Smallwood back into the house to talk to her. <u>See</u> (Tr. at 11-12, 85). Regardless of Investigator Crea's reasons for wanting to speak with Mrs. Smallwood inside the house, <u>see</u> [Doc. 56 at 21], the fact remains that the officers were not lawfully in the house with the consent of Mrs. Smallwood at the time the sweep took place.

Whether the officers were authorized to enter the residence on the basis of Smallwood's invitation at the front door is a closer question. It is undisputed that, as the officers approached the residence with weapons drawn to effect the arrest, Smallwood stepped onto the front porch and told the advancing officers to "come on in," while gesturing with his hand an invitation to enter the residence. (Tr. at 66, 76, 84). Nor is there any indication that Smallwood ever revoked his invitation after he was placed under arrest or voiced any objection as the officers subsequently entered his residence. See (Tr. at 77). Under these circumstances, the officers on the scene could reasonably have concluded that Smallwood consented to their entering of the residence. At the same time, the circumstances of Smallwood's initial encounter with the armed, approaching officers "tend[] to suggest an undertaking which is not entirely dependent on the consent and cooperation of the suspect." See United States v. Edmonson, 791 F.2d 1512, 1515 (11th Cir. 1986). In any event, even if the officers were not lawfully inside the residence at Smallwood's invitation, or on any other basis, for the reasons discussed hereinafter, the Court concludes that the motion to suppress evidence is due to be denied for the independent reasons that Mrs. Smallwood gave valid consent to the search which resulted in the seizure

of the evidence, and that, even if the initial sweep was unlawful, it did not taint Mrs.

Smallwood's valid consent.[19]

### 2.   Mrs. Smallwood's Consent to Search

Because the Court assumes, for the purposes of ruling on the motion to

suppress, that the protective sweep was illegal, it is necessary to "assess [Mrs.

Smallwood's] subsequent consent through a two-step inquiry: 'First, [the Court]

must determine whether the consent was voluntary.  Second, [the Court] must

determine whether the consent, even if voluntary, requires exclusion of the evidence

found during the search because it was the fruit of the poisonous tree—the product

of an illegal entry.'"  United States v. Smith, 688 F.3d 730, 738 (11th Cir. 2012)

(quoting Delancy, 502 F.3d at 1308).  "This two step approach is mandatory, and the

government bears the burden on both issues."  Id. (citation omitted).

---

[19] It is not evident from the record whether all of the officers who conducted
the initial sweep had exited the residence before Mrs. Smallwood returned to the
house and gave her consent to the search.  However, assuming that some of the
officers who swept the residence remained there unlawfully when Mrs. Smallwood
was accompanied back inside, suppression of the evidence seized pursuant to Mrs.
Smallwood's consent is nonetheless unwarranted, since her consent was valid and
was not tainted by the sweep itself or by any related unlawful conduct surrounding
the sweep.  Thus, in assuming the illegality of the sweep in this case, the Court
construes the sweep broadly, as encompassing both the entry that preceded it and
any continuing unlawful presence that followed it. See United States v. Delancy, 502
F.3d 1297, 1301 (11th Cir. 2007) (third party's consent to a search of her residence
was both voluntary and untainted by putatively unlawful entry and protective
sweep, where police encountered her during the sweep and obtained her consent
while they remained in the residence without legal justification).

### a.   *Mrs. Smallwood's Consent was Valid*

Smallwood argues that the government has not carried its burden of showing that Mrs. Smallwood's consent to the officers' search of the house and car was valid, primarily because: (1) the officers "dictated" her activities "from the moment that [they] arrived on the premises"; (2) the consent was given after Mrs. Smallwood had observed her husband's arrest and seen the officers enter her home, and the officers never explained to her that their entry of the home was a limited protective sweep; and (3) the officers never informed Mrs. Smallwood that she had the right to refuse consent to the search.  [Doc. 53 at 28-33].  The government responds that the officers had lawful authority to search because, under the totality of the circumstances, Mrs. Smallwood voluntarily consented to the search of the Charger and residence.  [Doc. 56 at 21-26].

"One of the well-established exceptions to the probable cause and warrant requirements is a search which is conducted pursuant to voluntary consent." United States v. Garcia, 890 F.2d 355, 360 (11th Cir. 1989) (citations omitted).  See also Schneckloth, 412 U.S. at 219; United States v. Reynolds, 526 F. Supp. 2d 1330, 1336 (N.D. Ga. 2007).  "In order for consent to a search to be deemed voluntary, it must be the product of an essentially free and unconstrained choice." Garcia, 890 F.2d at 360 (citation omitted).  The government bears the burden of proving that consent

was voluntary, United States v. Tovar-Rico, 61 F.3d 1529, 1536 (11th Cir. 1995), and voluntariness of consent is determined on the basis of the totality of the circumstances, Schneckloth, 421 U.S. at 227; Reynolds, 526 F. Supp. 2d at 1337. Relevant factors include whether the consenting party was free to leave or refuse consent, the existence of coercive police procedures, the extent of the consenting party's cooperation or awareness of a right to refuse consent, the consenting party's education and intelligence, and the consenting party's belief that no incriminating evidence would be found. United States v. Ramirez-Chilel, 289 F.3d 744, 752 (11th Cir. 2002); United States v. Purcell, 236 F.3d 1274, 1281 (11th Cir. 2001).

After a careful review of the record, the Court finds that Mrs. Smallwood voluntarily consented to the search of the residence and vehicle. When Investigator Crea asked Mrs. Smallwood for her consent to search the residence and the Charger parked in the driveway, Mrs. Smallwood quickly replied that she "didn't have a problem with [the officers] searching the house or the vehicle outside," (Tr. at 12-13, 87), and Investigator Crea testified that "she seem[ed . . . to understand . . . what [he was] asking her for permission to do," (Tr. at 23).[20]  The officers did not make any

_____

[20] It is undisputed that Mrs. Smallwood had the requisite authority to consent to the search of the residence and the Charger. See Reynolds, 526 F. Supp. 2d at 1336-37 (quoting Illinois v. Rodriguez, 497 U.S. 177, 181 (1990)) ("Consent may be obtained either by the person whose property is searched, or by 'a third party who possesses common authority over the premises,'" where "[c]ommon authority is based on 'mutual use of the property by persons generally having joint access or

threats or promises to Mrs. Smallwood, <u>see</u> (Tr. at 22-23), nor did they point or display their weapons at Mrs. Smallwood when she was asked for her consent to search or at any other time, <u>see</u> (Tr. at 21, 72, 86).  And although Investigator Crea testified that Mrs. Smallwood appeared to be a "little confused" when she learned that Smallwood was not a police officer, he added that "she understood after [he] explained to her what [he] was trying to accomplish that day and what [he] was doing there."  (Tr. at 12, 22-23, 41, 86).  Investigators Crea and Mauney also testified that Mrs. Smallwood did not appear to be under the influence of drugs or alcohol when she gave consent to the search, (Tr. at 22, 86), and that her demeanor remained "nice," "calm," "cool," "collected," "composed," and "rational," for the entire time the officers were at the house, (Tr. at 12, 22, 46, 86, 88).  Investigator Mauney further noted that Mrs. Smallwood's speech was normal and that she made casual conversation about hunting.  (Tr. at 86-87).

Mrs. Smallwood was also very cooperative with the officers and actually assisted in the search.  Not only did she retrieve the keys to the Charger and deliver them to Investigator Crea when he asked for consent to search the car, (Tr. at 13, 53-54, 87), she also showed the officers the location of what she identified as Smallwood's firearm, and she insisted that Investigator Crea take the original

---

control for most purposes.'").

28

package for the gun, in addition to the gun and magazines which he had already seized, (Tr. at 14-15). Nor did Mrs. Smallwood ever ask to speak with Smallwood, (Tr. at 54), or withdraw her consent to the search at any time, (Tr. at 88).[21]

Although the officers did not inform Mrs. Smallwood of her right to refuse consent, the mere failure of police to inform the consenting party of the right to refuse consent does not render the consent involuntary in the absence of coercive police behavior. See United States v. Zapata, 180 F.3d 1237, 1242 (11th Cir. 1999) (quoting Ohio v. Robinette, 519 U.S. 33, 39 (1996); Florida v. Royer, 460 U.S. 491, 497 (1983)) ("While the government's burden of proving the voluntariness of consent is not satisfied by 'showing a mere submission to a claim of lawful authority,' the government need not establish [the consenting party's] knowledge of the right to refuse consent 'as the *sine qua non* of an effective consent.'"). And while Smallwood contends that Mrs. Smallwood's observation of her husband's arrest and the protective sweep of her home would have seemed "coercive to the reasonable

---

[21] Smallwood concedes that Mrs. Smallwood was cooperative with the officers, but argues that her cooperation "must be viewed in the context of the fact that [Mrs.] Smallwood herself voiced the belief that her husband was a law enforcement officer[.]" [Doc. 53 at 32]. Putting aside the fact that Mrs. Smallwood came to understand that her husband was not in fact a police officer, before she consented to the search, see (Tr. at 12, 22-23, 41, 86), the Court fails to see how Mrs. Smallwood's beliefs about her husband's employment have any bearing on the critical question of whether the officers used coercion to gain her consent. Mrs. Smallwood's cooperation with the search in this case is simply another factor supporting a finding that her consent to the search was voluntary.

person in [Mrs.] Smallwood's position," [Doc. 53 at 32], consent has been found voluntary in circumstances far more coercive than those presented here, especially since Mrs. Smallwood was not under arrest or threatened with arrest when she consented to the search, see, e.g., United States v. Hidalgo, 7 F.3d 1566, 1571 (11th Cir. 1993) (consent held voluntary where the defendant had been "arrested by SWAT team members who broke into his home in the early morning, woke him, and forced him to the ground at gunpoint"); Garcia, 890 F.2d at 361 (consent was voluntary despite officers' refusal to accept suspect's conditional consent to search as well as threats to obtain a search warrant if the suspect did not consent to a full search); United States v. Long, 866 F.2d 402, 404 (11th Cir. 1989) (holding consent voluntary where officers asked for consent to search, stating that, if consent were refused, they would return and "dig the place up"); United States v. Espinosa-Orlando, 704 F.2d 507, 513 (11th Cir. 1983) (consent found voluntary despite fact that individual was arrested at gunpoint, forced to lie on the ground, and provided consent while one officer had his weapon drawn). See also Scott, 517 F. App'x at 650 (although defendant initially refused consent to a search of his home and eventually consented only while handcuffed and under arrest, consent was voluntary because it was "not obtained by coercive or deceptive [police] conduct"); Barsoum, 2012 WL 1405699, at *1, 3 (finding that defendant "freely consented" to the search of his

home, where agents pounded on his front door at 6:00a.m., pulled him out of his house and handcuffed and shackled him, and then conducted an unlawful sweep of his residence with his family inside, all the while with their weapons drawn and under "[c]ircumstances [that] were purposely intimidating").

Under the totality of the facts and circumstances in this case, the Court thus finds that Mrs. Smallwood knowingly and voluntarily consented to the search of the residence and car, and that her consent was therefore "the product of an essentially free and unconstrained choice." <u>Garcia</u>, 890 F.2d at 360. Accordingly, the evidence in this case is not due to be suppressed on the basis that the consent to search was invalid.[22]

### b.   *Mrs. Smallwood's Consent to Search Was Not Tainted*

Having found that Mrs. Smallwood voluntarily consented to the search of the residence and the vehicle, the Court now turns to consider whether her consent was

---

[22] Smallwood also asserts that his invitation of the officers to enter his residence just prior to his arrest does not constitute valid consent to the ensuing search since the search "exceeded any reasonable interpretation of the scope" of that invitation. [Doc. 53 at 26]. As the Court has already found that Mrs. Smallwood provided valid consent to the search of the residence, however, it is not necessary to decide whether the officers were entitled to search the residence on the additional basis of Smallwood's initial invitation. Nor is there any suggestion that Smallwood ever objected to the search of the residence or the car, although these were visible to him from his position in the back of the patrol car. <u>See</u> (Tr. at 67, 77); <u>Georgia v. Randolph</u>, 547 U.S. 103, 122-23 (2006) ("[A] physically present inhabitant's express refusal of consent to a police search is dispositive as to him, regardless of the consent of a fellow occupant.").

tainted by the putatively illegal sweep of the house.  See Delancy, 502 F.3d at 1308.

Smallwood argues that Mrs. Smallwood's consent, even if valid, was "tainted by the

illegal protective sweep" because "there was very close temporal proximity between

the . . . sweep and the consent"; there were no intervening circumstances "that

would help to dissipate the taint"; and the officers' "conduct was flagrant and

without any justifiable purpose."  [Doc. 53 at 36].  The government counters that,

even if the protective sweep was unlawful, Mrs. Smallwood's consent was not

tainted because "the record is clear that[] . . . [the sweep] did not cause [her] to

consent to the search of the car and house."  [Doc. 56 at 27].

 In determining if evidence is tainted by a prior constitutional violation, the

central inquiry is "whether, granting establishment of the primary illegality, the

evidence to which instant objection is made has been come at by exploitation of that

illegality or instead by means sufficiently distinguishable to be purged of the

primary taint."  Delancy, 502 F.3d at 1309 (citation omitted) (quoting Wong Sun v.

United States, 371 U.S. 471, 488 (1963)).  While no single factor is dispositive, the

Eleventh Circuit has "identified [] three helpful factors in framing the analysis: (1)

the temporal proximity of the illegal act and the subsequent consent, (2) the

intervening circumstances and (3) the purpose and flagrancy of the officers'

misconduct."  Smith, 688 F.3d at 739 (citation omitted).  These factors "are not meant

to be exhaustive," and "[t]he underlying question 'involves a pragmatic evaluation of the extent to which the illegal police conduct caused the [consenting party's] response.'" Id. (citations omitted).  At bottom, the Court must determine "whether the consent was sufficiently an act of free will to purge the primary taint of the unlawful invasion, or, alternatively, whether the causal connection had become so attenuated as to dissipate the taint." Id. (citation and internal marks omitted) (citing Delancy, 502 F.3d at 1309).

Applying these factors to the instant case, the Court finds that Mrs. Smallwood's consent was not tainted by the putatively unlawful sweep.  First, although the record does not establish a precise time-line, it is clear that Mrs. Smallwood consented to the search shortly after the protective sweep was finished, see (Tr. at 11-12, 38), and the government concedes that "the break between the [] sweep and [the] consent . . . was relatively brief[.]"  [Doc. 56 at 27].  Viewed in isolation, temporal proximity tends to support a finding of taint, see United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003); however, the actual "determination of how temporal proximity affects the underlying analysis" depends on the factual "character of the interaction between the law enforcement agents and the [consenting party]," Smith, 688 F.3d at 739.  Specifically, "[w]hen an officer's interaction with an individual is highly intrusive, the passage of time is less likely

to attenuate the officer's illegal act from the [] later consent"; but "[w]hen the circumstances suggest a less intrusive interaction, . . . [the] consent may be sufficiently attenuated from a prior illegal entry even if the time separating the two is relatively brief." Id. at 739-40.  Thus, "timing is not the most important factor" where consent is given under "relatively unintrusive circumstances," such as where the consenting party is not in custody or subjected to threats, and where the encounter between the consenting party and the officers is "conversational in tone[.]" Id. at 740 (citations and internal marks omitted).

Mrs. Smallwood was seated, unrestrained, in her own living room when she consented to the search. See (Tr. at 12, 43-44).  She was not in custody, as Smallwood concedes, [Doc. 53 at 31], and the officers did not point their weapons at her, or even display them in her presence, see (Tr. at 21, 72, 86).  Mrs. Smallwood was not threatened or coerced by the officers, see (Tr. at 22-23), she spoke with the officers in a "normal" conversational tone, and the overall tenor of her interaction with the officers was consistently described by the officers who observed her as "calm," "cool," "collected," and "rational," (Tr. at 12, 22, 46, 86-88).  Thus, the record reflects that Mrs. Smallwood gave consent under relatively unintrusive circumstances, and timing is therefore not the most important factor in this case. See Smith, 688 F.3d at 740-41 (assuming that interval between illegal entry and defendant's consent to

34

search was "relatively brief," "timing [was] not the most important factor"–and consent was not tainted–where officers explained their presence to defendant and did not point their guns at him, and where the encounter was conversational and defendant was not handcuffed or detained).

The Court next considers "whether any intervening circumstances 'interrupt[ed] the causal connection between the illegal act and the possibly tainted consent[.]'" Id. at 741 (first alteration in original) (quoting Delancy, 502 F.3d at 1311). Whether the consenting party is advised of the right to refuse consent is an "important intervening circumstance," Delancy, 502 F.3d at 1311, and it is undisputed that Mrs. Smallwood was not advised of her right to refuse consent before she consented to the search in this case, see (Tr. at 47); see also [Doc. 56 at 29]. However, the Eleventh Circuit has held that, even where officers do not warn the consenting party of the right to refuse consent, the "absence of evidence" that the officers used threats or coercion to interfere with the consenting party's ability to provide voluntary consent, itself "militates in favor of concluding that the causal connection between the officers' [prior unlawful conduct] and [the subsequent] consent had become so attenuated as to dissipate the taint." Smith 688 F.3d at 741 (citation and internal marks omitted) (citing Wong Sun, 371 U.S. at 487). There is no evidence that the officers coerced, threatened, or intimidated Mrs. Smallwood in any

35

way when she voluntarily consented to the search, or at any other time, and the absence of such evidence supports a finding that the consent was obtained by "means sufficiently distinguishable to be purged of the primary taint" of the putatively unlawful protective sweep. See Delancy, 502 F.3d at 1309 (citations omitted); see also Smith, 688 F.3d at 741 (defendant's consent to search was not tainted despite officers' initial failure to warn of the right to refuse consent, where there was no evidence that the officers' conduct following the assumed illegal entry "interfered with [defendant's] making a knowing, intelligent, and voluntary choice to [consent,] in the absence of any coercion or threats from the police"). This finding is also supported by the fact that, before asking for consent, Investigator Crea told Mrs. Smallwood why the officers were there and why her husband had been arrested, (Tr. at 12), and he was "pretty sure" that he would have explained to Mrs. Smallwood the difference between the initial sweep and the subsequent consent search, although he could not precisely recall that he did, see (Tr. at 41-42), and by the lack of any evidence that the officers exploited their initial presence in the home to intimidate Mrs. Smallwood into cooperating, see Scott, 517 F. App'x at 650.

The third factor–the purpose and flagrancy of the official misconduct–is the most straightforward in this case and weighs decisively in favor of finding that Mrs. Smallwood's consent was untainted by the protective sweep. To begin with,

nothing in the record suggests that the protective sweep was motivated by an ulterior purpose to obtain Mrs. Smallwood's subsequent consent to search, or indeed by anything other than a genuine and legitimate concern for officer safety. Investigators Duffield and Crea consistently testified that they conducted the sweep in order to ensure that the residence was safe and clear, and that they were not looking for, and did not seize, any evidence during the sweep. (Tr. at 67, 73, 79); see also (Tr. at 11 (Investigator Crea testifying that he swept the residence "to make sure there wasn't anybody hiding in the closets" or "or anybody in the residence that could have come out with a gun . . . [to] do [] harm")). Investigator Mauney likewise testified that he did not seize any evidence, and that he did not see anyone else seize any evidence, throughout the course of the sweep. (Tr. at 85, 91).

In explaining the purpose of the sweep, Investigator Crea also specifically noted that he was concerned about officer safety because, among other things, there was a firearms charge involved and the officers would have their backs turned to the residence at certain points during their execution of the arrest warrant. See (Tr. at 11, 67, 73, 75). While these concerns do not provide a reasonable articulable suspicion sufficient to justify a type-two Buie search, they do tend to support the officers' testimony that the sweep was motivated by a lawful and legitimate concern for officer safety. Thus, although the Court has "assumed arguendo that the [sweep]

itself was unlawful, . . . [it is] clear that the [officers] did not enter for an unlawful purpose." Smith, 688 F.3d at 741 (citation and internal marks omitted). See also United States v. Welch, 683 F.3d 1304, 1308 (11th Cir. 2012) (footnote omitted) (consent to search not tainted by prior assumed unlawful sweep, where "sweep was for the protection of the officers, not a subterfuge to intimidate and question [the consenting party]"). Cf. Barsoum, 2012 WL 1405699, at *4 (defendant's consent to a search of his residence was tainted by prior illegal protective sweep where the evidence showed that the purpose of the sweep was to gain defendant's consent to conduct a full-scale search of the house).

Nor is there any suggestion of flagrant police misconduct associated with either the initial protective sweep or the officers' later encounter with Mrs. Smallwood and the circumstances under which she voluntarily consented to the search. The officers did not coerce, trick, threaten, or intimidate Mrs. Smallwood in any way. See (Tr. at 21-23, 72, 86). They did not use the sweep as a pretext to search for evidence, and they did not touch the evidence that was later seized until after Mrs. Smallwood gave voluntary consent for them to do so. (Tr. at 11, 16, 67, 79). The sweep was brief in duration, lasting just a few minutes, and there is no suggestion that the scope of the sweep went beyond an appropriate cursory inspection of those places in the residence where a dangerous individual might be

38

concealed.  See (Tr. at 11, 16, 38, 67, 85, 91).  The officers did not exploit the assumed unlawful conduct by, for example, bringing to Mrs. Smallwood's attention any of the items that they had noticed during the sweep; they did not "use the fruits of the illegal protective sweep as leverage or as a tool of psychological coercion to persuade [Mrs. Smallwood] to consent to the search." Scott, 517 F. App'x at 650. See also Delancy, 502 F.2d at 1313 (officers did not act flagrantly by conducting protective sweep, because, even though the sweep included an unlawful search outside the scope of a protective sweep, the officers "did not tear the house apart" looking for evidence, or otherwise commit any "flagrant violation[s] of the law").

Finally, the fact that a "third party" (Mrs. Smallwood) and not the defendant provided the requisite consent, is yet another factor that weighs against the suppression of the evidence seized in this case.  See [Doc. 56 at 32-33 (citations omitted)]; Welch, 683 F.3d at 1308 (alteration in original) (footnote omitted) ("When [police] enter unlawfully but mistakenly and in good faith, and when they obtain the knowing, intelligent, and voluntary consent of a third party without exploiting their unlawful entry in any way, the purposes of the exclusionary rule would not be served by excluding valuable evidence.").  The Court thus concludes that the exclusion of evidence in this case is unwarranted because the evidence was seized pursuant to the knowing, intelligent, and voluntary consent of Mrs. Smallwood, and

because, even assuming that the protective sweep was illegal, Mrs. Smallwood's consent was not the "product of that illegality," <u>Scott</u>, 517 F. App'x at 650 (citation and internal marks omitted), but was "sufficiently attenuated from the [sweep] such that any potential taint would have fully dissipated," <u>Smith</u>, 688 F.3d 737-38.

### 3.  **The Evidence Was Properly Seized in Plain View**

Smallwood also appears to argue that certain pieces of evidence seized on July 15, 2013, should be suppressed due to "problems with the search itself[.]" [Doc. 53 at 36]. In particular, Smallwood contends that the government has failed to establish why it was necessary for Investigator Crea to seize the entire bag marked "Police," after he saw what appeared to be a U.S. Marshals badge inside, and that it is likewise "unclear why [Investigator] Crea seized the bulletproof vest." [<u>Id.</u> at 37]. Once Mrs. Smallwood consented to the search of the residence, however, the officers were authorized to seize any evidence that appeared in plain view within the scope of that consent.

Under the plain view doctrine, government agents may seize an object without a warrant provided that three conditions are satisfied: "(1) an officer is lawfully located in the place from which the seized object could be plainly viewed; (2) the officer has a lawful right of access to the object itself; and (3) the incriminating character of the item is immediately apparent." <u>United States v. Anyanwu</u>, Criminal

File No. 1:12–CR–190–TWT, 2013 WL 3283748, at *5 (N.D. Ga. June 28, 2013), adopted at *1 (citing Horton v. California, 496 U.S. 128, 136-37 (1990); United States v. Smith, 459 F.3d 1276, 1290 (11th Cir. 2006)). "For an item's incriminating character to be 'immediately apparent,' the police merely need probable cause to believe that the item is contraband." United States v. Simpson, 259 F. App'x 164, 167 (11th Cir. 2007) (per curiam) (unpublished) (citation omitted). See also United States v. Ochoa, 402 F. App'x 478, 484 (11th Cir. 2010) (per curiam) (unpublished). "[P]robable cause 'merely requires that the facts available to the officer would warrant a man of reasonable caution in the belief . . . that certain items may be contraband.'" United States v. O'Campo, 381 F. App'x 974, 977 (11th Cir. 2010) (per curiam) (unpublished) (second alteration in original) (quoting Texas v. Brown, 460 U.S. 730, (1983)).

Investigator Crea was lawfully present in the residence at the time of the seizure and had a lawful right of access to the evidence seized therein, because the evidence was discovered in plain view after Mrs. Smallwood consented to a general search of the residence.  Indeed, Mrs. Smallwood specifically gave her consent for the officers to search for a firearm, and it is plain from the record that the resulting search was both reasonable and limited to those places where a firearm might be found.  See (Tr. at 61).  The incriminating character of the "police tactical bag," (Tr. at 39), the belt buckle which appeared to be a U.S. Marshals badge, and the

41

bulletproof vest, was also immediately apparent in view of the charge of impersonating an officer. Investigator Crea was not required to empty the contents of the police bag and sift through them in order to sort out the incriminating contents from the non-incriminating, "thereby aggravating the intrusiveness [and duration] of the search." See United States v. Slocum, 708 F.2d 587, 605-06 (11th Cir. 1983) (citations and internal marks omitted). The bag itself was evidence of the crime charged, so the bag was properly seized.

For the same reasons, the emergency blue lights and the U.S. Marshals badge with the "credentials type [] wallet setting" were properly seized from the Charger as evidence of impersonating an officer and in conformity with the terms of Mrs. Smallwood's consent. See (Tr. at 13-14). The incriminating character of the gun in the bedroom was likewise immediately apparent because the officers knew that Smallwood was a convicted felon charged with unlawful possession of a firearm, see United States v. Holt, No. 2:08-cr-38-FtM-29DNF, 2008 WL 5191472, at *5 (M.D. Fla. Dec. 10, 2008) (firearms observed under defendant's bed while officers looked for items permitted by search warrant could be seized under plain view exception because officer knew defendant was a convicted felon, and incriminating nature of firearms was thus immediately apparent), and Investigator Crea did not seize any evidence until after Mrs. Smallwood gave her express consent to the search, (Tr. at

42

60-61).  Accordingly, notwithstanding Smallwood's objections, the evidence in this case was properly seized in accordance with the requirements of the plain view doctrine and pursuant to the valid, untainted consent of Mrs. Smallwood, and the motion to suppress evidence, [Doc. 20], is therefore due to be denied in its entirety.

## B.    Motion to Suppress Statements

Smallwood moves to suppress the statements he made prior to receiving Miranda warnings following the arrests of July and August, 2013, [Doc. 21; Doc. 53 at 37-39], arguing generally that "[t]he [g]overnment [has] offered no justification for the [officers'] failure to Mirandize him at the time of [] arrest," and, in particular, that he "was not Mirandized until well into a conversation about the charges[ against him]," after the arrest of August 19, 2013, [Doc. 53 at 39].  The government responds that Smallwood's pre-Miranda statements at both arrests should not be suppressed, since the statements were "volunteered statements" that "were not the result of any interrogation."  [Doc. 56 at 36].

The ruling in Miranda requires law enforcement officers to apprise a defendant in custody of his Fifth Amendment rights before engaging in interrogation.  See Garcia v. Singletary, 13 F.3d 1487 (11th Cir. 1994).  "A defendant is in custody for the purposes of *Miranda* when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'"

United States v. Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (citation omitted) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). Interrogation for Miranda purposes "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" United States v. Gomez, 927 F.2d 1530, 1538 (11th Cir. 1991) (alteration in original) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)). In contrast, "[v]oluntary and spontaneous comments by an accused . . . are admissible evidence if the comments were not made in response to government questioning." United States v. LaFond, No. 1:13–cr–92–01–WSD–LTW, 2013 WL 6269448, at *2 (N.D. Ga. Dec. 4, 2013) (alteration in original) (citation and internal marks omitted) (quoting United States v. Sanders, 315 F. App'x 819, 823 (11th Cir. 2009) (per curiam) (unpublished)). See also Cannady v. Dugger, 931 F.2d 752, 754 (11th Cir. 1991) ("Voluntary and spontaneous comments, even after Miranda rights are asserted, are admissible evidence if the comments were not made in response to government questioning."). Put differently, "[t]he absence of *Miranda* warnings does not preclude the admission of a spontaneous statement." LaFond, 2013 WL 6269448, at *2 (citation omitted) (citing United States v. Jules, 244 F. App'x 964, 972 (11th Cir. 2007) (per curiam) (unpublished)), and "[s]pontaneous statements made before *Miranda* warnings are

44

given are not required to be suppressed," <u>United States v. Moreno</u>, Criminal Indictment No. 1:10–CR–251–TWT–AJB–06, 2012 WL 1068638, at *5 (N.D. Ga. Mar. 8, 2012), adopted by 2012 WL 1068532, at *1 (N.D. Ga. Mar. 29, 2012) (citations omitted).

Although Smallwood was clearly in custody when he made his pre-<u>Miranda</u> statements at both arrests, it is equally clear that the statements were spontaneous and voluntary, and were not made in response to police interrogation. After Smallwood was taken into custody at the arrest of July 15, 2013, Investigator Duffield explained to Smallwood the charges against him, and Smallwood repeatedly stated that he had not done anything wrong. (Tr. at 67-69). However, Investigator Duffield did not ask Smallwood any questions "about the charges against him or his conduct." (Tr. at 68). There is no suggestion that Investigator Duffield threatened or coerced Smallwood during this encounter, nor did he engage his firearm in any way. <u>See</u> (Tr. at 71). Under these circumstances, the exchange between Investigator Duffield and Smallwood "did not require *Miranda* warnings because [Investigator Duffield's] comments did not invite or elicit a response from [Smallwood] or encourage him to make spontaneous incriminating remarks." <u>United States v. Jones</u>, No. 1:12–cr–380–WSD, 2013 WL 5963125, at *7 (N.D. Ga. Nov. 7, 2013), adopted at *3 (footnote and citation omitted). And while Investigator

45

Duffield informed Smallwood of the pending charges prior to the administration of Miranda warnings, it is well established that "[a]n officer telling a suspect what is happening or what charges have been made against him is not 'interrogation' for Miranda purposes." Id. (alteration in original) (citation and internal marks omitted); see also id. at *7 n.18 (quoting Innis, 446 U.S. at 300–01) (noting that the "explanation of charges is 'normally attendant to arrest and custody' and is therefore excluded from the definition of interrogation because it does not 'reflect a measure of compulsion above and beyond that inherent in custody itself.'"). Accordingly, since Investigator Duffield did not act to elicit any incriminating statements from Smallwood by explaining the pending charges or otherwise, Miranda warnings were not required prior to Smallwood's pre-Miranda statements at the arrest of July, 2013, and Smallwood's statements following that arrest were therefore not obtained in violation of Miranda.

Similarly, Smallwood's pre-Miranda statements following the arrest of August 19, 2013, were both spontaneous and voluntary and were not elicited in response to any government questioning. After Smallwood was taken into custody and secured in Agent Booth's vehicle, Agent Booth explained to Smallwood the charges against him, which Smallwood appeared to understand. See (Tr. at 97-98). Smallwood then began asking Agent Booth about the charges, and Agent Booth cautioned

Smallwood, in response, that he should not be talking because he had not been advised of his <u>Miranda</u> rights. (Tr. at 98, 100, 111). Shortly afterwards, Smallwood made another spontaneous statement about a matter relating to the pending charges, and Agent Booth once again interrupted Smallwood and advised him that he had not been read his <u>Miranda</u> rights. (Tr. at 100, 111). When Smallwood made a similar statement for a third time, Agent Booth pulled over to the side of the road and read Smallwood his <u>Miranda</u> rights. (Tr. at 100). Agent Booth testified that he did not read Smallwood his <u>Miranda</u> rights before that time because he had no intention of questioning Smallwood following the arrest, and there is no indication in the record that Agent Booth questioned Smallwood in any way until after the <u>Miranda</u> warnings were issued. (Tr. at 99-100). In addition, Agent Booth did not make any threats or promises to Smallwood, (Tr. at 103), and none of the officers pointed their firearms at Smallwood at any time after Smallwood was initially placed in restraints upon his arrest, (Tr. at 104-05). Agent Booth also testified that he did not raise his voice or use "an ugly tone" when speaking with Smallwood. (Tr. at 106).

Contrary to Smallwood's assertion that he and Agent Booth engaged in a "conversation about the charges," [Doc. 53 at 39], prior to the administration of <u>Miranda</u> warnings, the record reflects that Smallwood's pre-<u>Miranda</u> statements to Agent Booth were entirely spontaneous and voluntary, and there is no evidence that

47

Agent Booth asked any questions or made any statements "which open[ed] up a more generalized discussion relating directly or indirectly to the investigation.'" LaFond, 2013 WL 6269448, at *3 (quoting Christopher v. Florida, 824 F.2d 836, 845 (11th Cir. 1987)).  In sum, Agent Booth's initial explanation to Smallwood of the pending charges, and his brief and direct admonitions that Smallwood should not speak with him in the absence of Miranda warnings, did not constitute interrogation under Miranda, and Smallwood's motion to suppress his pre-Miranda statements of August, 2013, is therefore without merit and is due to be denied.  See United States v. Springfield, No. CR406–390, 2007 WL 1140912 at *3 (S.D. Ga. Apr. 13, 2007)).

In sum, "[t]here is simply 'no evidence that the [officers] made any statements or engaged in any actions reasonably likely to elicit an incriminating response from [Smallwood],'" Jones, 2013 WL 5963125, at *7 (internal marks omitted) (quoting United States v. Perry, Criminal Indictment No. 2:11–CR–0026–RWS–SSC, 2012 WL 601892, at *11 (N.D. Ga. Jan. 19, 2012), adopted by 2012 WL 601890, at *1 (N.D. Ga. Feb. 23, 2012)), before the administration of Miranda warnings, nor is there any evidence that "force or coercion [was] . . . directed at [Smallwood]," id. (first alteration in original) (internal marks omitted) (quoting United States v. Matayoshi, No. 2:11–cr–29–FtM–36SPC, 2011 WL 4903075, at *8 (M.D. Fla. Sept. 22, 2011), adopted by 2011 WL 4902963, at *2 (M.D. Fla. Oct. 14, 2011)), at any time.  Because

48

the "totality of the circumstances indicates that [Smallwood's] statement[s] [were] spontaneous and not elicited by the functional equivalent of interrogation," United States v. Hickman, No. 8:12–CR–472–T–17EAJ, 2013 WL 672580, at *5 (M.D. Fla. Jan. 24, 2013), adopted by 2013 WL 672681, at *1 (M.D. Fla. Feb. 25, 2013) (citation omitted), Miranda warnings were not required prior to Smallwood's pre-Miranda statements at either arrest, and Smallwood's pre-Miranda statements were thus not obtained in violation in Miranda.[23]

Finally, while Smallwood's post-hearing brief does not directly challenge the admissibility of his post-Miranda statements at either arrest, see [Doc. 53 at 37], to the extent his motion, [Doc. 21], could be construed to do so, the Court finds that the government has satisfied its burden of showing that Smallwood's post-Miranda statements are admissible because they were made voluntarily after a valid waiver of Miranda rights. See United States v. Chirinos, 112 F.3d 1089, 1102 (11th Cir. 1997). In Miranda, the Supreme Court acknowledged that custodial interrogations, by their very nature, create "compelling pressures which work to undermine the

---

[23] Moreover, to the extent Smallwood argues that his pre-Miranda statements should be suppressed in view of the coercive circumstances inherent in the arrests themselves, any such argument is without merit because Smallwood has not "'show[n] a link between the coercion and his statements to establish that he was subjected to the functional equivalent of interrogation.'" Jones, 2013 WL 5963125, at *7 n.20 (citation omitted) (quoting United States v. Young, 377 F. App'x 965, 969 (11th Cir. 2010) (per curiam) (unpublished)).

individual's will to resist and to compel him to speak where he would not otherwise do so freely."  384 U.S. at 467.  To address this inherent compulsion and protect a suspect's Fifth Amendment privilege against self-incrimination, Miranda established certain procedures which law enforcement officers must follow.  Specifically, prior to the initiation of questioning, officers must fully advise the suspect of the government's intention to use his statements to secure a conviction, and must inform him of his rights to remain silent and to "have counsel present . . . if [he] so desires."  Id. at 468-70.  Miranda further requires that law enforcement respect the suspect's decision to exercise his rights as outlined in the warnings.  "If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease."  Id. at 473-74 (footnote omitted).  "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present."  Id. at 474.

A defendant may waive his rights if the waiver is made knowingly, intelligently, and voluntarily.  Id. at 444.  This inquiry has two distinct dimensions:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception.  Second, the waiver must have been made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it.  Only if the 'totality of the circumstances surrounding the interrogation' reveal both an uncoerced choice and the requisite level of

comprehension may a court properly conclude that the *Miranda* rights have been waived.

United States v. Patterson, Criminal No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *3 (N.D. Ga. Aug. 10, 2007), adopted at *1 (citation omitted) (quoting United States v. Barbour, 70 F.3d 580, 585 (11th Cir. 1995)).  See also Moran v. Burbine, 475 U.S. 412, 421 (1986); Edwards v. Arizona, 451 U.S. 477, 482 (1981); Fare v. Michael C., 442 U.S. 707, 725 (1979).  "No single factor is necessarily determinative of the issue whether a defendant knowingly and intelligently waived his rights but the court must engage in a fact-specific inquiry based on all of the circumstances." Patterson, 2007 WL 2331080, at *3 (citation omitted).  However, an express oral or written waiver of Miranda is strong proof of the validity of the waiver.  United States v. Stephens, 202 F. Supp. 2d 1361, 1370 (N.D. Ga. 2002).  To find a waiver involuntary, coercion by law enforcement is a "necessary predicate," Colorado v. Connelly, 479 U.S. 157, 167 (1986), and "in the absence of [such] coercion a court cannot conclude a defendant's waiver or inculpatory statements are involuntary," United States v. Minard, 208 F. App'x 657, 660 (10th Cir. 2006) (unpublished).

Shortly after the arrest on July 15, 2013, Investigator Crea adequately advised Smallwood of his Miranda rights by reading the rights from a printed Miranda rights card provided to him by the Gwinnett County Sheriff's Department.  See (Tr. at 16-17, 24, 68; Def. Ex. 9).  Smallwood replied that he understood his rights, (Tr. at

17), and Investigator Duffield also testified that Smallwood appeared to understand the rights that were read to him, (Tr. at 68). Smallwood then indicated that a certain "weapon . . . in the house" belonged to his wife, in response to a question from Investigator Duffield. (Tr. at 68, 81). The officers did not threaten Smallwood or make him any promises, neither did they display their firearms in his presence after he was taken into custody. See (Tr. at 25, 71). Investigators Crea and Duffield also testified that Smallwood did not appear to be under the influence of drugs or alcohol, (Tr. at 25, 71-72), and Investigator Duffield stated that he spoke to Smallwood in a "normal" and unexcited tone of voice, (Tr. at 72).

Following the arrest of August 19, 2013, Agent Booth informed Smallwood of his Miranda rights by reading the rights from a card issued by the Federal Law Enforcement Training Center after Smallwood repeatedly attempted to talk to Agent Booth while being transported to jail. (Tr. at 101-02). Smallwood replied that he understood his rights and that he wanted to speak with Agent Booth, and the two then spoke about the pending charges on their way to the Atlanta Detention Center. See (Tr. at 100-03). Agent Booth testified that Smallwood appeared to be able to understand what Agent Booth was asking and telling him, and that Smallwood did not appear to be under the influence of drugs or alcohol. (Tr. at 103). Agent Booth did not make any threats or promises to Smallwood, and, while his gun was drawn

during the initial encounter with Smallwood leading up to the arrest, neither Agent Booth nor any of the other arresting officers pointed their guns at Smallwood once he had been placed in restraints. (Tr. at 104-05). Agent Booth further indicated that he spoke with Smallwood in a conversational tone, and that the trip to the Detention Center was brief, lasting about 35 minutes. (Tr. at 106).

On these facts, the government has shown that, under the totality of the circumstances, Smallwood was aware of the nature of his rights being abandoned and the consequences of his decision to abandon them and that he knowingly and intelligently waived his <u>Miranda</u> rights. Accordingly, Smallwood's statements, made both before and after the issuance of <u>Miranda</u> warnings on July 15, 2013, and August 19, 2013, were made voluntarily and in conformity with the dictates of <u>Miranda</u>, and Smallwood's motion to suppress statements, [Doc. 21], is therefore due to be denied in its entirety.

## C. Motion to Suppress Testimony and Statements of Mrs. Smallwood

Smallwood moves to suppress any testimony by Mrs. Smallwood that would "impinge upon the confidential communications privilege enjoyed by married persons," [Doc. 26 at 1], along with any of Mrs. Smallwood's statements that reveal confidential communications that Smallwood made to her, [<u>id.</u> at 4]. Smallwood further moves to suppress any remaining statements made by Mrs. Smallwood on

Confrontation Clause grounds, in the event that Mrs. Smallwood does not testify at trial. [Id.]. The government contends that Mrs. Smallwood's statements to the investigating officers in this case may be grouped into four distinct categories, only one of which falls within the ambit of the marital communications privilege. See [Doc. 34 at 3-6, 8-10]. Specifically, the government asserts that Mrs. Smallwood's statements described: (1) Smallwood's statements and actions before the time they were married; (2) Smallwood's communications made during the marriage and in the presence of third parties; (3) Smallwood's actions during the marriage; and (4) Smallwood's statements made during the marriage and in the presence of Mrs. Smallwood alone. [Id. at 3-6]. The government represents that it will not seek to introduce at trial the testimony of Mrs. Smallwood relating to the fourth category, that is, Smallwood's statements made in confidence to Mrs. Smallwood while they were married, [Doc. 34 at 8], but argues that the motion to suppress testimony is due to be denied as to the first three categories of statements because those statements are not protected by the marital communications privilege.

"There are two recognized types of marital privilege: the marital confidential communications privilege and the spousal testimonial privilege." United States v. Singleton, 260 F.3d 1295, 1297 (11th Cir. 2001) (per curiam) (citing Trammel v. United States, 445 U.S. 40, 50-51 (1980)). "The marital privilege asserted by

54

[Smallwood] is [the] marital communications privilege, which has been recognized by [the Eleventh Circuit]." Id. (footnote and citations omitted).  When available, "[t]he marital communications privilege[] . . . excludes information privately disclosed between husband and wife in the confidence of the marital relationship." United States v. Abram, 171 F. App'x 304, 310 (11th Cir. 2006) (per curiam) (unpublished) (citing Trammel, 445 U.S. at 51).  "However, the privilege does not apply to communications made in the presence of third parties, and generally applies only to utterances, not acts." Id. (citing Pereira v. United States, 347 U.S. 1, 6 (1954)).  See also Pereira, 347 U.S. at 6 (citations omitted) ("The presence of a third party negatives the presumption of privacy.  So too, the intention that the information conveyed be transmitted to a third person.").  Marital communications are presumed to be confidential, but "that presumption may be overcome by proof of facts showing that they were not intended to be private." Pereira, 347 U.S. at 6 (citations omitted).  Moreover, the marital communications privilege is not available to exclude statements made during a "moribund" marriage, when the spouses have permanently separated with no reasonable expectation of reconciliation.  See Singleton, 260 F.3d at 1300 (footnote, citations, and internal marks omitted).

Smallwood contends, in general terms, that "[a]fter [he] was arrested, his wife was interviewed by law enforcement officers and upon information and belief [Mrs.]

Smallwood revealed confidential marital communications during the interview." [Doc. 26 at 2]. However, Smallwood has failed to identify any particular statements by Mrs. Smallwood that he contends are protected by the marital communications privilege. See generally [Doc. 26]. Moreover, as noted above, the government has agreed not to introduce any of Mrs. Smallwood's statements that disclose any privileged and confidential communications made by Smallwood in the course of their marriage. See [Doc. 34 at 8]. Accordingly, it is **RECOMMENDED** that the motion to suppress the statements or testimony of Mrs. Smallwood that impinge upon the marital communications privilege, [Doc. 26], be **GRANTED IN PART** and **DENIED IN PART**. Specifically, to the extent Smallwood seeks to suppress statements by Mrs. Smallwood that reveal confidential marital communications made by Smallwood during the marriage, the motion is due to be **GRANTED**; to the extent Smallwood seeks to suppress Mrs. Smallwood's statements about Smallwood's actions and communications made before the marriage, or about his actions and non-confidential communications made during the marriage, the motion is without merit and is due to be **DENIED**.

Smallwood further moves to suppress any remaining statements made by Mrs. Smallwood "on other grounds including the Confrontation Clause if [Mrs.] Smallwood will not be a live witness at trial." [Id. at 4]. The government responds

56

that Smallwood's motion is premature because it is unknown whether Mrs. Smallwood will testify at trial.  [Doc. 34 at 11].  The government thus argues that "this portion of [Smallwood's motion is not ripe, and should be deferred for ruling until the time of trial has arrived."  [Id.].  The Court agrees.

The Confrontation Clause of the Sixth Amendment provides that, '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him."  U.S. Const. amend. VI.  "The principal protection derived from the confrontation right is the right to effective cross-examination of the [prosecution's] witnesses."  Fowler v. Tucker, No. 3:11cv244/RV/EMT, 2012 WL 5519743, at *11 (N.D. Fla. Sept. 28, 2012) (citing Crawford v. Washington, 541 U.S. 36, 61 (2004); United States v. Owens, 484 U.S. 554, 559 (1988)).  More specifically, the Confrontation Clause prohibits the admission of out-of-court testimonial statements where the declarant is not subject to cross-examination at trial and the defendant has not had a prior opportunity to cross-examine.  See Crawford, 541 U.S. at 53-54, 59.  However, Smallwood's motion to suppress Mrs. Smallwood's statements on Confrontation Clause grounds is not ripe for ruling at this juncture of the proceedings because it is unknown whether: (1) the government will seek to introduce testimonial hearsay of Mrs. Smallwood at trial; (2) Mrs. Smallwood will be subject to cross-examination at trial as a live witness; or (3) Smallwood will obtain

a prior opportunity to cross-examine Mrs. Smallwood concerning her out-of-court statements, in the event that she is unavailable to testify at trial.  If the government seeks to introduce at trial any out-of-court testimonial statements made by Mrs. Smallwood–and if Mrs. Smallwood does not testify at trial–then Smallwood may renew his objection to the admission of those statements on the ground that they violate his rights under the Confrontation Clause.   Accordingly, it is **RECOMMENDED** that Smallwood's motion to suppress the statements of Mrs. Smallwood on Confrontation Clause grounds, [Doc. 26 at 4], be **DENIED** as premature.

### D.    Motion to Dismiss Counts One and Three of the Indictment

Smallwood moves to dismiss Counts One and Three of the indictment as insufficient in their allegations.  [Doc. 27].  Specifically, Smallwood argues that Count One is deficient because it alleges that he may have possessed one of several guns, without apprising him of which particular gun he allegedly possessed, and that, as a result, he is unable to determine whether a future prosecution for the possession of any particular firearm would constitute double jeopardy.  [Id. at 5]. Smallwood contends that Count Three is insufficient because the time-frame in which the offense is alleged to have been committed–sometime between November, 2012, and July, 2013–is "so unspecific as to deny [him] a reasonable opportunity to

prepare to defend against this allegation." [Id. at 1]. Alternatively, Smallwood moves for a bill of particulars as to both counts. [Doc. 27]. The government responds that Count One appropriately charged Smallwood with possession of all four firearms that were seized from his residence, [Doc. 35 at 5-9], and that the "lack of a specific date in Count Three is not a fatal defect" because " timing is not an element of the offense," [id. at 11]. The government thus argues that both Counts One and Three satisfy the constitutional requirements for an indictment, and that Smallwood's motion is therefore due to be dismissed in its entirety. [Doc. 35]. The government further contends that Smallwood is not entitled to a bill of particulars as to Counts One and Three because "[he] has already received the information necessary for trial preparation through the Indictment." [Id. at 11].

"Federal Rule of Criminal Procedure 7(c) governs the requirements for what must be contained in the indictment to properly charge a crime." United States v. Ressler, Criminal File No. 1:06-CR-103-1-TWT, 2007 WL 602210, at *2 (N.D. Ga. Feb. 16, 2007), adopted at *1. "Rule 7(c)(1) requires that '[t]he indictment or information [] be a plain, concise, and definite written statement of the essential facts constituting the offense charged and [] be signed by an attorney for the government.'" Id. (alterations in original) (quoting Fed. R. Crim. P. 7(c)(1)). "Rule 7(c)(1) further provides that '[f]or each count, the indictment or information must give the official

or customary citation of the statute, rule, regulation, or other provision of law that the defendant is alleged to have violated.'"  Id.  (alteration in original) (citation omitted).  "'Generally, an indictment is sufficient if it: 1) sets forth the elements of the offense in a manner which fairly informs the defendant of the charge against which he must defend and 2) enables him to enter a plea which will bar future prosecution for the same offense.'"  United States v. Germany, 296 F. App'x 852, 862 (11th Cir. 2008) (unpublished) (citation omitted) (quoting United States v. Poirier, 321 F.3d 1024, 1028 (11th Cir. 2003), corrected on other grounds, 2003 WL 21211926 (11th Cir. Apr. 1, 2003) (per curiam)).  The Eleventh Circuit has held that "'when analyzing challenges to the sufficiency of an indictment, courts give the indictment a common sense construction, and its validity is to be determined by practical, not technical, considerations.'"  Id. (citation omitted) (quoting Poirier, 321 F.3d at 1029). Furthermore, "[i]f an indictment specifically refers to the statute on which the charge was based, the reference to the statutory language adequately informs the defendant of the charge."  United States v. Fern, 155 F.3d 1318, 1325 (11th Cir. 1998) (citation omitted).  "Similarly, if the facts alleged in the indictment warrant an inference that the jury found probable cause to support all the necessary elements of the charge, the indictment is not fatally deficient on Fifth Amendment grounds."  Id. (footnote and citation omitted).

Count One of the indictment charges Smallwood with knowingly possessing "at least one" of four specifically identified firearms, in violation of 18 U.S.C. § 922(g). [Doc. 14 at 1]. Smallwood asserts that Count One is defective because it fails to specify which particular firearm or firearms he actually possessed. [Doc. 27 at 5]. "The law is well established, however, that where an indictment charges several means of violation of the statute in the conjunctive, proof of only one of the means is sufficient to convict." United States v. Griffin, 705 F.2d 434, 436 (11th Cir. 1983) (per curiam) (citation omitted). Thus, the indictment was not required to allege which particular firearms, among those already listed in the indictment, Smallwood possessed in violation of § 922(g); proof that Smallwood possessed one or any combination of the firearms would be sufficient to convict him at trial, and Smallwood is therefore on notice that he should prepare to defend against the charge that he possessed one, or any, of the firearms identified in the indictment.

Nor has Smallwood explained how the allegations of Count One fail to provide sufficient factual detail to enable him to rely upon a judgment under the indictment as a bar against double jeopardy for a subsequent prosecution of the same offense, as the indictment clearly identifies each firearm by make, model, type, and serial number. Count One also expressly alleges each of the essential elements of an offense under § 922(g), and Smallwood does not contend otherwise.

61

Moreover, "[t]he simultaneous, undifferentiated possession of multiple firearms constitutes only one offense under [§ 922(g)]." United States v. Bonavia, 927 F.2d 565, 568 (11th Cir. 1991) (footnotes, citations, and internal marks omitted). Accordingly, because there is no indication that the firearms in this case were possessed at different times or places, the indictment properly charged Smallwood with a single offense of the statute. See id. at 568-69 (citations omitted).

Count Three of the indictment alleges that, sometime between November, 2012, and July, 2013, in the Northern District of Georgia, Smallwood, accompanied by a coworker whose initials are G.H., intentionally impersonated a federal officer in the course of repossessing a vehicle located within a secured parking deck in the midtown Atlanta area. [Doc. 14 at 3]. Count Three further alleges that Smallwood approached security officers working at the parking deck, and falsely and knowingly told them that he was a U.S. Marshal, with the intention of persuading them to grant him access to a vehicle located inside. [Id.]. Smallwood does not contend that Count Three fails to present all of the elements of the charged offense under 18 U.S.C. § 912, but argues only that the time-frame in which the offense is alleged to have been committed it too broad to enable him to prepare a meaningful defense. See [Doc. 27 at 1]. Smallwood's argument is without merit. "Where time is not an essential element of the offense, it is sufficient to charge facts which show that the offense was committed within the statutory period of limitation," and "in

such a case, even though there be a defect in the allegation as to time, it is one of form only." United States v. Steele, 178 F.3d 1230, 1234 (11th Cir. 1999) (citation and internal marks omitted). Indeed, "it is [] hornbook law that great generality in the allegation of date is allowed–at least where, as here, the exact time of the crime's commission is not important under the statute allegedly violated." Id. (citations omitted). In other words, "because time is not an element of the crime of [impersonating a federal officer], the indictment was not fatally broad for failing to include precise dates of [impersonation]." Id. (citation and internal marks omitted).

Alternatively, Smallwood moves for a bill of particulars, asking the government to identify which particular firearms Smallwood possessed on July 15, 2013, and precisely when the alleged offense of impersonating a federal officer occurred. [Doc. 27 at 2]. Rule 7(f) of the Federal Rules of Criminal Procedure provides that the Court "may direct the government to file a bill of particulars." Fed. R. Crim. P. 7(f). The purpose of a bill of particulars is to inform the defendant of the charge against him in sufficient detail to permit adequate defense preparation and to minimize surprise at trial. United States v. Colson, 662 F.2d 1389, 1391 (11th Cir. 1981); United States v. Diecidue, 603 F.2d 535, 563 (5th Cir. 1979).[24] "A bill of

---

[24] Decisions of the Fifth Circuit rendered before October 1, 1981, are binding precedent of the Eleventh Circuit. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

particulars, properly viewed, supplements an indictment by providing the defendant with information *necessary* for trial preparation," <u>United States v. Anderson</u>, 799 F.2d 1438, 1441 (11th Cir. 1986), and "[g]eneralized discovery" is not "an appropriate function of a bill of particulars," or "a proper purpose in seeking the bill," <u>id.</u> (citation omitted); <u>see also</u> <u>United States v. Davis</u>, 582 F.2d 947, 951 (5th Cir. 1978). Further, a defendant is not entitled to a bill of particulars describing information which is already evident from other sources, such as elsewhere in the indictment or in discovery. <u>United States v. Rosenthal</u>, 793 F.2d 1214, 1227 (11th Cir. 1986).

The Court finds that a bill of particulars is not necessary to supplement the indictment in this case, since the indictment clearly sets forth the essential elements of the offenses charged and thus fairly informs Smallwood of the precise charges against which he must defend. Moreover, in support of his motion, Smallwood states only that he "requests a bill of particulars for the [g]overnment to specify important facts which will allow him to prepare his defense," [Doc. 27 at 6], but he has failed to show how the information sought in the bill is reasonably necessary to enable him to prepare his defense, avoid surprise, or plead double jeopardy in a subsequent proceeding, <u>see generally</u> [<u>id.</u>]. <u>See also</u> <u>United States v. Gorel</u>, 622 F.2d 100, 104 (5th Cir. 1979) ("No showing was made that the matters requested were necessary to inform the defendant of the charge against him with sufficient precision

to enable him to prepare his defense or avoid surprise.  Neither were they shown to be necessary for pleading his acquittal or conviction in bar of further prosecution for the same offense.").  Accordingly, it is **RECOMMENDED** that Smallwood's motion to dismiss Counts One and Three of the indictment, or, alternatively, for a bill of particulars, [Doc. 27], be **DENIED**.

### III.  CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that Smallwood's motions to suppress evidence and statements, [Docs. 20 & 21], as well as his motion to dismiss Counts One and Three of the indictment, or, in the alternative, for a bill of particulars, [Doc. 27], be **DENIED**, and that his motion to suppress the testimony and statements of Mrs. Smallwood, [Doc. 26], be **GRANTED IN PART** and **DENIED IN PART**.  There are no other pending matters before the Magistrate Judge, and the undersigned is aware of no problems relating to the scheduling of this case other than completion of the pre-plea Presentence Report.  See [Doc. 62].

**IT IS THEREFORE ORDERED** and **ADJUDGED** that this action be and the same is hereby, certified Ready for Trial.

**IT IS SO ORDERED AND RECOMMENDED**, this 27th day of June, 2014.

RUSSELL G. VINEYARD
UNITED STATES MAGISTRATE JUDGE